FILED & ENTERED

AUG 25 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY wesley    DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>East Coast Foods, Inc.<br><br><br><br><br><br>Debtor(s).<br>_____<br><br>Bradley D. Sharp, Chapter 11 Trustee<br><br>Plaintiff(s),<br><br>   v.<br><br><br>Roscoe's Intellectual Properties LLC<br><br><br><br>Defendant(s).<br>_____ | CHAPTER 11<br><br>Case No.: 2:16-bk-13852-BB<br>Adv No: 2:17-ap-01001-BB<br><br>**MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART TRUSTEE'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:     July 26, 2017<br>Time:    11:00 AM<br>Courtroom: 1539 |

      Bradley D. Sharp ("Trustee"), the chapter 11 trustee for East Coast Foods, Inc. (the "Debtor"), moved for summary judgment avoiding a prepetition transfer of the Debtor's intellectual property to defendant Roscoe's Intellectual Properties LLC ("Defendant") under both actual fraud fraudulent transfer theories [Cal. Civ. Code

1    § 3439.04(a)(1), made applicable by 11 U.S.C. § 544(b), and 11 U.S.C. § 548(a)(1)(A)]

2    (the "First Claim for Relief") and constructive fraud fraudulent transfer theories [Cal. Civ.

3    Code §§ 3439.04(a)(2) and 3439.05, made applicable by 11 U.S.C. § 544(b), and 11

4    U.S.C. § 548(a)(1)(B)] (the "Second Claim for Relief").  For the reasons set forth below,

5    this Court hereby denies the Trustee's request for summary judgment on the Second

6    Claim for Relief and grants summary judgment in the Trustee's favor on the Trustee's

7    First Claim for Relief.

8    It is axiomatic that a court may not grant summary judgment where there is a

9    genuine issue of material fact.  Summary judgment is only appropriate where, based on

10   the undisputed facts, movant is entitled to judgment as a matter of law.  Fed. R. Civ.

11   Proc. 7056(a).  Summary judgment should be denied where, in order to rule in movant's

12   favor, the court must weigh conflicting evidence or make credibility determinations.

13   See Zetwick v. County of Yolo, 850 F.3d 436, 441 (9th Cir. 2017); Anderson v. Liberty

14   Lobby, Inc., 477 U.S. 242, 249 (1986).

15   In light of these principles, it is a rare case in which a court may grant summary

16   judgment under an actual fraud fraudulent transfer theory, but this is one such case.

17   The undisputed facts of this case lead inexorably to the conclusion that the transfer of

18   the Debtor's intellectual property to the Defendant on the eve of the Debtor's bankruptcy

19   filing was a transfer made with the actual intent to hinder, delay or defraud the Debtor's

20   creditors.  Accordingly, summary judgment for the Trustee on his First Claim for Relief is

21   warranted.

22   However, genuine issues of material fact preclude the Court from granting the

23   Trustee's motion for summary judgment on his Second Claim for Relief.  The Court

24   cannot determine on this record what the Intellectual Property was actually worth at the

25   time of its transfer to the Defendant, whether the Debtor was insolvent at the time of the

26   transfer, whether the Debtor was rendered insolvent by that transfer or whether the

27   Debtor can be said to have failed any of the other tests of financial condition necessary

28   to establish that a constructively fraudulent transfer occurred.  Accordingly, the Court

must deny the Trustee's motion for summary adjudication of the Second Claim for Relief.

## II

## THE UNDISPUTED FACTS

1.      The Debtor owns and operates four Roscoe's Chicken 'N Waffles restaurants in the Los Angeles area.

2.      The Debtor is a California corporation wholly-owned by Herbert Hudson ("Hudson").

3.      Defendant Roscoe's Intellectual Properties LLC ("Defendant") is a California limited liability company wholly-owned by Hudson.

4.      Defendant was formed on February 4, 2016.

5.      The Debtor filed a voluntary chapter 11 case in the United States Bankruptcy Court for the Central District of California on March 25, 2016 (the "Petition Date").

6.      The Trustee was appointed chapter 11 trustee on or about September 28, 2016.

7.      On March 10, 2016, the Debtor entered into a Trademark and Domain Purchase Agreement with Defendant (the "Original Sale Agreement"), pursuant to which the Debtor agreed to sell and Defendant agreed to buy the trademarks, "Roscoe's House of Chicken 'N Waffles/Rooster & Waffle Logo," as well as "Roscoe's," and certain related domain names (collectively, the "Intellectual Property"), for the price of $3,500,000, plus up to an additional $2,500,000 (the "Contingency"), depending on the valuation reflected in an appraisal to be obtained at a later date (the "Subject Transfer").

8.      Hudson, acting on behalf of the Debtor, retained Pluris Valuation Advisors, LLC ("Pluris") on or about February 21, 2016, to value the Intellectual Property, but the parties did not wait to obtain a valuation of the Intellectual Property from Pluris before entering into the Original Sale Agreement.

9.      Instead, paragraph 3 of the Original Sale Agreement provides, in pertinent part,

> In the event the appraisal is not more than the purchase price plus the contingency set forth above, the Purchase Price shall be the appraisal amount determined by Pluris.  In the event the appraisal is higher, then Buyer has the option to accept the appraisal amount as the Purchase Price or to terminate this agreement, without any liability to Seller.

10.      In other words, so long as the appraisal showed that the Intellectual Property was worth $5,500,000 or less, the Purchase Price was to be the *lesser* of $5,500,000 and the appraisal amount.  If it turned out that the appraisal showed the Intellectual Property to be worth *more than* $5,500,000, Defendant would not be obligated to pay this higher price unless it elected to do so.  If Defendant did not want to pay the higher price, it could simply cancel the agreement without any liability.  That is, the Debtor was "locked in" even if the purchase price went down, but Defendant was protected against the prospect of the purchase price's increasing beyond the amounts specified in the agreement.

11.      In the Original Sale Agreement, Defendant agreed to pay the purchase price over a period of 15 years (180 months), with interest thereon at the rate of 9 percent per annum.

12.      At the same time, the Debtor entered into a Trademark License Agreement (the "License Agreement") with Defendant, pursuant to which Defendant licensed the Debtor to use the Intellectual Property for a period of five years,[1] in exchange for 1.5 percent of the Debtor's quarterly net sales.

---

[1] Paragraph 11 of the License Agreement, Exhibit 6 to Defendant's opposition to the Trustee's motion (the "Opposition"), reflects that, at the expiration of this initial 5-year term, the agreement will automatically renew for successive five year terms, provided the agreement has not already been terminated.  However, under paragraphs 11.2 and 26.1, either party may terminate the contract for any reason or for no reason 60 days before the renewal date.  In other words, even if the Debtor fully performed all of its obligations under the License Agreement, the Defendant would be free to terminate the license agreement at the end of the initial or any subsequent 5-year period.with or without cause.

13.     Defendant did not give the Debtor a security interest or collateral of any kind to secure the payment of the purchase price for its Intellectual Property.

14.     Neither Hudson nor any other person or entity personally guaranteed payment of the purchase price of the Intellectual Property.

15.      The record does not reflect the existence of any assets of the Defendant other than the Intellectual Property purchased from the Debtor.

16.     The Subject Transfer was recorded with the U.S. Patent and Trademark Office on March 23, 2016 (two days prior to the Petition Date).

17.     On May 4, 2016, without obtaining bankruptcy court approval, the Debtor and the Defendant executed an amendment to the Original Sale Agreement (the "Amended Agreement") that increased the purchase price for the Intellectual Property to $5,500,000, to be paid over 180 months with interest at 9 percent per annum.

18.     Pursuant to the Amended Agreement, Defendant was supposed to commence making payments of the purchase price on July 10, 2016.  The first payment was to be in the amount of $139,672.  Thereafter, payments were to be made at the rate of $33,285 per month. (According to calculations provided by Hudson, this figure represents a monthly payment from Defendant of $55,785, less anticipated royalty payments from the Debtor of $22,500 per month.  See paragraph 19 below.)

19.     Paragraph 5 of the Original Sale Agreement provides that the first payment of the purchase price may be offset by the amount of royalties owed by the Defendant to the Debtor, and the Defendant has the option to offset future payments of the purchase price against its estimate of the amounts that the Debtor will owe to the Defendant for royalties, with reconciliations and balancing payments to be made quarterly within thirty days after the end of each calendar quarter.

20.      The following are the only payments that Defendant claims have been made under the Original Agreement or the Amended Agreement:

a.  a check from Shoreline Foods (another entity owned by Hudson) in the amount of $270,000 on October 14, 2016; and

b.   checks 2254 through 2258 from Waffle Plaza (another entity owned by

Hudson) totaling $420,000 on September 22, 2016.

These payments total $690,000, which Defendant claims is actually $120,243 more

than was actually due from Defendant as of August 10, 2017.

21.    Defendant did not pay monthly payments currently or conduct quarterly

reconciliations of actual royalties due.  The only payments that Defendant claims to

have made were the lump sum payments from affiliates identified in paragraph 20

above.

22.    No payments at all were made under either the Original Sale Agreement

or the Amended Agreement before September 22, 2016 – a date that is more than 6

months after the Subject Transfer and one day after the court-appointed examiner,

Christopher Barclay, filed a status report [Docket No. 186].

23.    In his report, the examiner alleged, among other things, irregularities in the

Debtor's accounting systems, problems with Hudson's management of the Debtor,

numerous undisclosed insider transfers and several unauthorized payments to

professionals.  In other words, notwithstanding the due dates set forth in the Amended

Agreement, neither Defendant nor any of its affiliates paid even a single dollar of the

purchase price for the Intellectual Property until the day after it seemed likely that a

chapter 11 trustee would be appointed shortly.

24.     As of the date of the Subject Transfer, the Debtor was a defendant in a

the following lawsuits:

(a)    Daniel Beasley v. East Coast Foods, Inc., Los Angeles County

Superior Court No. BC509995 (the "Beasley Action").  On October 5, 2015, a judgment

(the "Beasley Judgment") in the amount of $3.2 million was entered against the Debtor

and in favor of its former employee, Daniel Beasley.  The Beasley Judgment is currently

on appeal in the California Court of Appeal, Appeal No. B268753.

(b)    Dixon, et al. v. Roscoe's House of Chicken and Waffles, et al., Los

Angeles County Superior Court No. BC592220, filed August 21, 2015.  The Dixon

Action is stayed with respect to the Debtor.

(c)    Duffie v. Herb Hudson Roscoe's House of Chicken 'N Waffles, et al., Los Angeles County Superior Court No. BC606073, filed January 5, 2016.

(d)    Flores v. East Coast Foods, Inc., Los Angeles County Superior Court No. BC611457, filed on February 24, 2016.

(e)    Harrington et al v. East Coast Foods, Inc., et al., Los Angeles County Superior Court No. BC508879 (the "Harrington Action"), filed May 13, 2013. The Harrington Action is a class action against the Debtor in which a settlement was reached in January 2016.  The settlement has not been consummated.

(f)    Pamal v. East Coast Foods, Inc., et al., Los Angeles County Superior Court No. BC533263, filed January 15, 2014 (the "Pamal Action").  The Pamal Action is stayed with respect to the Debtor.

(g)    Pickett v. Hi Point Studios, Inc., et al., Los Angeles County Superior Court No. BC500905, filed February 13, 2013.

(h)    Thompson v. Herb Hudson Roscoe's House of Chicken 'N Waffles, et al., Los Angeles County Superior Court No. BC606071, filed January 5, 2016.

22.    On April 25, 2016, Ron Maroko of the Office of the United States Trustee conducted the first meeting of creditors under Bankruptcy Code section 341(a) in this chapter 11 case.  Hudson appeared and testified *under oath* on behalf of the Debtor.  In response to questions from a creditor and the Office of the United States Trustee, Hudson on behalf of the Debtor responded as follows:

Ron Maroko ("RM"):  Okay, so why don't you tell us a little about why the bankruptcy case was filed.

Herbert Hudson ("HH"):  Because of a slew of lawsuits.  Mainly, lawsuits.

RM:  Just lawsuits?

HH:  Yes.

RM:  Lawsuits that you had filed?  Lawsuits that were filed against you?

HH:  Yes, against the corporation.

RM:  Okay, and what about those lawsuits that made you decide that you needed to file the case?

HH:  Well, one of the lawsuits, I think it was the...I forget the law firm, but they levied my bank accounts, so I had to file a lawsuit to stop them.  Otherwise, we would not be in business.

RM:  Okay, at the time of the bankruptcy filing, how many lawsuits was East Coast Foods involved in as a defendant?

HH:  About four, but more coming.

. . . .

Peter Davidson ("PD"):  Peterson Davidson, Ervin, Cohen & Jessup, representing the Harrington plaintiffs and their counsel.  Um, I want to go back to the transfer of the intellectual property that took place – that took place in January, is that correct?

Herbert Hudson ("HH"):  Uh, I believe so.

PD:  What was the purpose of transferring the intellectual property in Roscoe's at that time?

HH:  Well, we had a few incidents where entities and people were trying to get a hold of the intellectual property, so we figured it'd be better just to take it out of East Coast's name and put it in an LLC.

PD:  What do you mean they were trying to get a hold of it?

HH:  For protection.  Through lawsuits, through this and that.

PD:  They were trying to stop creditors from getting possession…

HH:  Not creditors, no, I didn't say creditors.  Business deals.

PD:  Can you explain that a little further?  Somebody wanted to buy the intellectual property?

HH:  No, they were trying to get it by fraud, I guess you would say.  And certain deals we were making which woke me up to the fact that the intellectual property was in danger by it being where it was at, so…

PD:  Why was it safer…

HH:  And then we also needed money, so I figured we could…

PD:  Why was it safer in the new entity rather than remaining where it was?

HH:  Want to answer that for me?

VK:  That was the advice of his counsel, so…

1        PD:  And who was his counsel that gave that advice?

2        VK:  Rostam Law.

3        25.    In his declaration in opposition to the Trustee's motion for summary

4  judgment (the "Hudson Declaration") [Docket No. 40], Hudson offers the following

5  testimony concerning the reasons for the Subject Transfer:[2]

6        a.  Prior to the time of the Debtor's bankruptcy filing, he had been

7            negotiating with companies such as Sony, Home Shopping Network,

8            and a frozen food company to expand Roscoe's brand through various

9            licensing arrangements.  During the negotiations with all three

10          companies, it was suggested and agreed that the trademarks and

11          tradenames should be set aside and placed in a different entity.

12          [Hudson Declaration, at par. 12.]

13        b.  He had long been giving thought to significant expansion of the

14          Roscoe's name and brand.  He formed a separate entity in 2013 called

15          Hudson-Munoz LLC for the purpose of licensing the Roscoe's brand.

16          He also consulted with an intellectual property lawyer named Frank

17          Frisenda in or around the fall of 2015 and discussed with him a wide

18          range of issues on how best to create a business platform to

19          implement an expansion plan.  Mr. Frisenda was the one who

20          recommended the creation of a single-asset limited liability company

21          for the purpose of licensing the Roscoe's intellectual property to

22          various third parties.  That was the reason that Defendant was formed.

23          [Hudson Declaration, at par. 17.]

24        c.  He learned that creating a separate entity for the purpose of owning

25          the Intellectual property was the quickest, easiest and least expensive

26

27
          ―――――――――――――――
[2] The Court sustained hearsay objections this testimony to the extent that Hudson was attempting to testify as to the truth of statements made to him by advisors or lawyers as to a desirable structure for the Subject Transaction. However, this testimony is admissible to the extent that it is being offered as evidence of Hudson's state of mind at the time he entered into the Subject Transaction.

28

way to protect the goodwill associated with the business, that
establishing an IP holding company would be the best way to do it from
a structuring perspective and that this type of corporate structuring is
relatively common in the restaurant industry.  [Hudson Declaration, at
par. 18.]

d. He learned that placing assets in a separate holding company may
make it easier to determine the value of the IP assets separate from
the operations and goodwill generated by the restaurant chain.
[Hudson Declaration, at par. 19.]

e. Another primary motivation for him to enter into the Subject
Transaction was to create a more effective means of administration.
Given that there were seven locations (four operated by the Debtor
and three others operated by other Hudson-owned entities), there
needed to be a more effective level of centralized management of the
intellectual property associated with Roscoe's name and brand.
[Hudson Declaration, at par. 21.]

f. Hudson admits that there was also an element of asset protection in
his motivation to enter into the Subject Transaction, "but certainly not in
the manner asserted by the Trustee's MSJ.  I was told that by
separating out the Roscoe's IP into a separate entity, it would provide
a level of future protection from people or companies that might be
inclined to exploit or infringe it without my consent."  [Hudson
Declaration, at par. 22.]

26. In paragraph 29 of the Hudson Declaration, at page 8, Hudson explains,
"Had I fully understood the scope and breadth of the questions being asked of
me at the 341(a) examination, I would have answered the question posed
['Why did you transfer the intellectual property assets of East Coast Foods to
Roscoe's Intellectual Property, LLC?'] on an expanded basis.  Without

preparation or the opportunity to rehabilitate my response (i.e., I was never given a transcript to review, correct or provide any level of supplemental response), it is understandable to see how the brief answer that I gave could be misconstrued to be an admission that the transfer was being made in order to defeat the claims of existing creditors and to remove a valuable asset from the reach of those creditors.  However, this was not the case at all as reflected by my desire to obtain an independent valuation, RIPL's agreement to pay a 9% interest rate on the unpaid sums, and the fact that RIPL has already paid $690,000 towards the purchase price and is current on all such payments."

27. In paragraph 14 of the Hudson Declaration, at page 4, Hudson explains, "This was a single question, to which I was expected to answer immediately and I did; however, I did not have the benefit of any level of preparation for this hearing and admittedly, was not very articulate in my response.  The complete list of reasons for the transfer of assets are for more compelling and while I knew exactly why this transfer was made, without any form of preparation or further questioning from my own lawyer on this point, it is easy to see how my response could be viewed as an effort to take the asset value of the intellectual property away from the claims of creditors.  This was not the case at all as evidenced by, among other things, the fact that Debtor contracted with an independent valuation company, Pluris Valuation Advisors LLC ("Pluris"), to obtain an independent, fair market valuation of the intellectual property in order to make sure that RIPL was paying fair market value for those assets."

## III

### THE RECORD IS REPLETE WITH BADGES OF FRAUD

Rarely do the parties to an allegedly fraudulent transfer openly admit that it was

their intention to hinder, delay or defraud creditors by entering into the transaction.

Therefore, in the majority of cases, actual intent to hinder, delay or defraud must be

inferred from the circumstances surrounding the transfer.

Among the more common circumstantial indicia of fraudulent intent at the time of

the transfer are: (1) actual or threatened litigation against the debtor; (2) a purported

transfer of all or substantially all of the debtor's property; (3) insolvency or other

unmanageable indebtedness on the part of the debtor; (4) a special or close relationship

between the debtor and the transferee; (5) retention by the debtor of the property

involved in the putative transfer.  See Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34

F.3d 800, 805-06 (9th Cir. 1994) and cases cited therein.  But other factors have been

identified as well.

California Civil Code § 3439.04(b) provides the following list of nonexclusive

factors or "badges of fraud" for a court to consider for the purpose of divining fraudulent

intent:

1. Whether the transfer or obligation was to an insider.

2. Whether the debtor retained possession or control of the property after the

transfer.

3. Whether the transfer or obligation was disclosed or concealed.

4. Whether the debtor was sued or threatened with suit before the transfer was

made or obligation incurred.

5. Whether the transfer was of substantially all of the debtor's assets.

6. Whether the debtor absconded.

7. Whether the debtor removed or concealed assets.

8. Whether the value of the consideration received by the debtor was reasonably

equivalent to the value of the asset transferred or obligation incurred.

9. Whether the debtor was insolvent or became insolvent shortly after the

transfer was made or obligation incurred.

10. Whether the transfer occurred shortly before or shortly after a substantial

1  debt was incurred; and

2      11. Whether the debtor transferred essential assets of the business to a

3  lienholder who then transferred the assets to an insider of the debtor.

4  Cal. Civ. Code § 3439.04(b).

5      These factors are intended "to provide guidance to the trial court, not compel a

6  finding one way or another." <u>Filip v. Bucurenciu</u>, 129 Cal.App.4th 825, 834, 28 Cal. Rptr.

7  3d 884 (2005).  There is no mathematical formula for applying these factors.  No

8  minimum number of factors is required to establish actual intent, and a court may find

9  actual intent based on the evidence in the case even if no badges of fraud are present.

10  Conversely, specific evidence may negate an inference of fraud notwithstanding the

11  presence of a number of badges of fraud.  <u>Wolkowitz v. Beverly (In re Beverly)</u>, 374

12  B.R. 221, 236 (Bankr. 9th Cir. 2007).  "The presence of a single badge of fraud may spur

13  mere suspicion; the confluence of several can constitute conclusive evidence of an

14  actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening

15  purpose." <u>Id.</u> (quoting <u>Max Sugarman Funeral Home, Inc. v. A.D.B. Inv'rs</u>, 926 F.2d

16  1248, 1254-55 (1st Cir. 1991)).

17      A careful review of the undisputed facts of this case reveals the following badges

18  of fraud:

19  • The transfer was to an insider – an entity wholly-owned by the same person who

20      owns 100 percent of the Debtor;

21  • Hudson, the Debtor's principal, negotiated the Subject Transfer on behalf of both

22      the transferor and the transferee; the Subject Transfer cannot in any sense of the

23      word be characterized as an "arms-length" transaction;

24  • The Debtor retained possession and control of the Intellectual Property after the

25      Subject Transfer in the sense that it was permitted to continue to use the

26      Intellectual Property as if nothing had changed; however, after the Subject

27      Transfer, the Debtor was required to pay the Defendant 1.5 percent of its gross

28      revenues for this privilege and the Debtor's right to use the Intellectual Property

could be terminated without cause at the expiration of any 5-year term;

- The Debtor filed chapter 11 fifteen days after entering into the Original Sale Agreement at a time when it was beset by "a slew of lawsuits";

- There is no evidence that the Subject Transfer was concealed.  Defendant recorded the Subject Transfer with the U.S. Patent and Trademark Office on March 23, 2016 (two days before the Petition Date).  But for this recordation, the Subject Transfer might have been avoided as not properly perfected;

- The Intellectual Property is absolutely critical to the operation of the Debtor's business; without the use of this property, the Debtor has no business.  The Intellectual Property constitutes the essential assets of the Debtor's business;

- The parties retained an independent valuation firm, but did not wait to obtain a valuation from Prius before entering into the Subject Transfer.  Instead, they structured the transaction in such a way as to ensure that, although the purchase price could go down based on the results of the valuation to any amount (i.e., there was no "floor"), it could not exceed the cap placed on it in the agreement without the Defendant's consent;

- Although it was on appeal, a judgment in the Beasley Action for $3.2 million had been entered against the Debtor within a few months prior to the Subject Transfer;

- Hudson testified at the first meeting of creditors that the purpose of the Subject Transfer was "for protection" to get the Intellectual Property out of the Debtor's name to keep parties that were trying to get possession of it "through lawsuits" from doing so.  Hudson denies that these people were creditors and asserts that they were trying to get the Intellectual Property "by fraud." (The Court takes judicial notice of the claims alleged in these lawsuits.  None of them has anything to do with the Intellectual Property.  They are all lawsuits by employees or former employees asserting employment-related claims.)

- The Subject Transfer was made on the eve of bankruptcy to a newly-formed entity that had no assets other than the assets it acquired in the Subject Transfer;

- Under the Original Sale Agreement and the Amended Agreement, the Debtor would not receive a large cash payment in exchange for the transfer of its essential assets.  Instead, the Debtor was to receive a small down payment (that was not paid in a timely manner) and monthly payments thereafter over a period of 15 years;

- The Defendant was permitted to setoff against the amount of its monthly payments a stream of royalty payments to be paid to it by the Debtor in exchange for the use of the Intellectual Property;

- The Defendant did not provide the Debtor with any collateral for its payment obligations, and no one guarantied these obligations.  The Defendant did not have the financial wherewithal to make the required payments under the agreements at the time it entered into the Subject Transfer;

- The initial down payment required under the Amended Agreement was not paid in a timely manner.  None of the monthly payments were made in a timely manner.  The only payments that Defendant claims to have made were payments from other entities owned by Hudson – payments totaling $420,000 from Waffle Plaza on September 22, 2016 (one day after the examiner filed his status report) and a payment of $270,000 from Shoreline Foods on October 14, 2016;

- None of the testimony offered by Hudson discusses why the Subject Transfer was structured in such a way as to leave the Debtor without the ability to ensure that it would be able use the Intellectual Property that it needed to run its business after a period of 5 years; and

- None of the testimony offered by Hudson explains why the Subject Transfer was structured in such a way as to make someone other than the Debtor the owner of the newly-established special purpose entity into which the Intellectual Property was transferred.

In short, the undisputed facts of this case reveal that Hudson caused the Debtor and the Defendant to enter into a transaction that provided tremendous value and benefits to Defendant and no assurance whatsoever for the Debtor that it would be able to collect the purchase price for the Intellectual Property or to retain the ability to continue to operate its business at the end of 5 years.  No business would ever enter into such a transaction unless it was controlled by the person that was receiving the benefits of this transaction.  And when did this transaction occur?  On the eve of the Debtor's bankruptcy filing at a time when the Debtor was the subject of a "slew of lawsuits."

The end result of the transaction was to make it impossible for a representative of the Debtor's creditors to be able to sell the Debtor's business to anyone other than Hudson or another entity that he controlled for anything remotely resembling the value that the Debtor's business had immediately prior to the Subject Transaction.  Who in their right mind would purchase the Debtor's assets without knowing what they would have to pay to Defendant at the end of the initial 5-year period for the privilege of continuing to use the Intellectual Property?  Any prospective purchaser would have no alternative but to enter into negotiations with Hudson for an extended licensing agreement for, or a separate purchase of, the Intellectual Property.  And this is, of course, the precise predicament in which the Trustee currently finds himself as he attempts to formulate an exit strategy for this chapter 11 case.

All of the facts and circumstances surrounding the Subject Transfer scream actual intent to hinder, delay or defraud.  And, before Hudson had had an opportunity to be coached by counsel, he himself admitted that putting the value of the Intellectual

Property beyond the reach of people who were trying to get at it through lawsuits was the purpose of the transaction.  It would be hard to imagine a clearer example of an actual fraud fraudulent transfer.

## IV

## THE ONLY EVIDENCE OFFERED IN OPPOSITION TO THE MOTION
## IS INSUFFICIENT TO CREATE A GENUINE ISSUE OF MATERIAL FACT
## AS TO THE INTENT WITH WHICH THE SUBJECT TRANSFER WAS MADE

In an effort to raise a triable issue of material fact, Defendant offers the Hudson Declaration.  In that declaration, Hudson testifies that (1) Hudson did not have the opportunity to confer with counsel or properly prepare before admitting in response to a direct question that the purpose of the Subject Transfer was to keep the Intellectual Property away from parties who were suing the Debtor and (2) it could not have been his intent to deprive the Debtor of the value of the Intellectual Property because he hired an independent valuation firm to perform a valuation of the Intellectual Property and agreed to pay 9 percent interest on the purchase price.

However, Prius, the independent valuation firm retained by the Debtor, never actually provided the parties with a valuation report.  The parties were in too much of a hurry to complete the Subject Transfer before the bankruptcy filing to wait for the results of the valuation.  (In the interim, the parties structured the Original Sale Agreement to impose the risk of a lower valuation on the Debtor and to give the Defendant an out if the valuation came in higher than expected.)  And Defendant never actually paid a dime toward the purchase price until months after the initial payment was due and it appeared imminent that a chapter 11 trustee would be appointed.   And it is worthy of note that the manner in which the Defendant agreed to pay the purchase price – *in monthly installments over a period of 15 years without any collateral or even a third party guaranty* – would make the promissory note that the Debtor received worth

substantially less than the face amount of the purchase price even if the face amount of the purchase price itself was fair.  Moreover – and this is critical – a transfer can be made with actual intent to hinder, delay or defraud creditors – and can negatively impact the ability of creditors to collect on their debts -- even if the transferee agrees to pay reasonably equivalent value in exchange for the transfer.

Hudson's testimony about the benefits of putting the Intellectual Property into a separate LLC and the fact that he has been thinking about doing this for years does not raise a genuine issue of material fact as to the intent with which he entered into this particular transaction on behalf of both the Debtor and the Defendant.  The question is not whether it would have been an actual fraud fraudulent transfer for Hudson to set up a special purpose entity and sell the Intellectual Property to that entity for reasonably equivalent value, the question is whether the Subject Transfer itself – and the particular manner in which it was structured -- was an actual fraud fraudulent transfer.  It would certainly have been possible for Hudson to structure a transaction of the Intellectual Property that would not have been a fraudulent transfer, but that transaction would have borne little resemblance to the transaction that actually occurred.

Hudson could have achieved all of the objectives outlined in the Hudson Declaration without diverting all the value of the Intellectual Property to himself.  Hudson could have transferred the Intellectual Property to a special purpose entity owned by the Debtor.  He could have actually obtained an independent valuation of the Intellectual Property and actually paid the purchase price in cash.  He could have provided for a significantly shorter payout period and given the Debtor collateral or at least a personal guaranty for the amount of the purchase price.  *And, most importantly*, *he could have ensured that the Debtor would have the right to use the intellectual property that it needed to run its business in perpetuity and not merely for a period of 5 years*.  He did none of these things.  Instead, he structured the Subject Transfer in a way that would never in the farthest reaches of anyone's imagination have been approved by anyone who was acting in the interests of the Debtor and/or its creditors.

1    Under the circumstances, the testimony offered by Hudson as to the reason for

2  transferring the Intellectual Property to a special purpose entity is not even relevant to,

3  let alone probative of, the real issue here.  The issue is why did Hudson cause the

4  Debtor to enter into *the Subject Transfer*, not why might there have been good reasons

5  for the Debtor to have entered into some other transaction that placed its Intellectual

6  Property into a special purpose entity.  He offers no explanation for the manner in which

7  the Subject Transfer was structured, except for the explanation that he provided under

8  oath when he was first asked the question – there were people who were trying to get a

9  hold of the Intellectual Property through "lawsuits," so he figured that it would be better

10  to take it out of the Debtor's name and put it into a separate LLC "for protection."

11    And what were these lawsuits about?  The court has taken judicial notice of the

12  claims alleged in these actions.  These lawsuits have nothing to do with the Intellectual

13  Property itself.  They do not represent attempts to obtain an interest in the Intellectual

14  Property by fraud or otherwise.  They are claims by employees or former employees

15  based on alleged harassment, discrimination, retaliation and/or other employment-

16  related misconduct.  The plaintiffs in these lawsuits seek monetary damages.  In other

17  words, if and when these plaintiffs obtained judgment in their favor in these actions, they

18  would be creditors of the Debtor.  Hudson may dispute that the plaintiffs had meritorious

19  claims, but there is no genuine dispute that, by transferring away assets of the Debtor to

20  protect them from these plaintiffs, Hudson intended to hinder, delay or defraud parties

21  who might turn out to be the Debtor's creditors.

22

23    V

24  **THE COURT CANNOT GRANT SUMMARY JUDGMENT**

25  **ON THE CLAIM THAT THE SUBJECT TRANSFER**

26  **WAS A CONSTRUCTIVE FRAUD FRAUDULENT TRANSFER**

27    In order to establish that the Subject Transfer was a constructive fraud fraudulent

28  transfer, whether he proceeds under nonbankruptcy law or under section 548 of the

1   Bankruptcy Code, the Trustee must establish that the Debtor received less than

2   reasonably equivalent value in exchange for the Intellectual Property and that the

3   Debtor's financial condition failed one of the standards set forth in the relevant statutes.

4   Although serious questions exist as to the Debtor's financial condition both before and

5   after the Subject Transfer and the extent to which the Debtor received reasonably

6   equivalent value in exchange for the Intellectual Property, neither issue is suitable for

7   summary adjudication.

8        The record does not contain any admissible evidence as to the value of the

9   Intellectual Property.  The documents prepared by Prius are difficult to read or

10  understand and were authenticated only by the Hudson Declaration.  The Court

11  sustained the Trustee's objections to the admission of these documents on hearsay

12  grounds.  And, without admissible evidence as to the value of the Intellectual Property,

13  the Court cannot assess whether the consideration received in exchange was

14  reasonably equivalent.

15       Further, although it might be possible to determine from the undisputed facts the

16  approximate amount of the Debtor's known liabilities as of the date of the Subject

17  Transfer, without knowing the value of the Intellectual Property, the Court cannot assess

18  whether the Debtor these liabilities rendered the Debtor insolvent at the time of the

19  transfer.  Therefore, the Trustee's request for summary judgment on his constructive

20  fraud fraudulent transfer claims must be denied.

21

22                                    **VI**

23              **THE DEFENDANT'S REQUEST THAT AVOIDANCE OF**

24              **THE TRANSFER BE CONDITIONED ON THE TRUSTEE'S**

25                **REPAYMENT OF $690,000 MUST BE DENIED**

26       As the Court has determined that the Subject Transfer constitutes an actual fraud

27  fraudulent transfer under Bankruptcy Code §§ 544(b) and 548(a)(1)(A), Bankruptcy

28  Code § 550(a) permits the Trustee to recover for the benefit of the estate the property

1  transferred or, "if the court so orders, the value of such property . . . ."  Defendant

2  requested that it be ordered to pay the balance of the purchase price in lieu of having to

3  return the Intellectual Property.  The court denies that request.  The Trustee prefers to

4  recover the Intellectual Property itself, and there are no facts or circumstances that

5  would make requiring the Defendant to return the Intellectual Property inequitable,

6  inappropriate or impractical.  Accordingly, pursuant to section 550(a), concurrently

7  herewith, the Court will grant the Trustee's motion for summary judgment on his seventh

8  claim for relief and direct the Defendant to turnover the Intellectual Property to the

9  Trustee.

10    Defendant also requested a refund of the $690,000 paid by Shoreline Foods and

11  Waffle Plaza in September and October of 2016 (the "Affiliate Payments"), yet provides

12  no authority to support this request.  When a court avoids a transfer as fraudulent, the

13  transferee is not necessarily entitled to a refund of any of the consideration that it paid.

14  Certain limited protections are available to good faith transferees, see 11 U.S.C. §

15  548(c) ("a transferee that takes for value and in good faith has a lien on or may retain

16  any interest transferred or may enforce any obligation incurred, as the case may be, to

17  the extent that such transferee or oblige gave value to the debtor in exchange for such

18  transfer or obligation") and 11 U.S.C. § 550(e) (a good faith transferee may assert a lien

19  on property recovered to secure the lesser of the cost of improvements it made or the

20  increase in value attributable to these improvements), but even these limited protections

21  are unavailable to a party who received a transfer with the actual intent to hinder, delay

22  or defraud creditors.  Such a party would not qualify as a good faith transferee.

23    Pursuant to Federal Rule of Bankruptcy Procedure 3002(c)(3), which applies in

24  chapter 7, 12 and 13 cases, an unsecured claim that arises or becomes allowable as a

25  result of a judgment avoiding a claimant's interest in property may be filed within 30

26  days after the judgment becomes final.  Federal Rule of Bankruptcy Procedure 3003(c)

27  provides that, in chapter 11 cases, the court shall fix the time within which proofs of

28  claim may be filed, and that, "Notwithstanding the expiration of that time, a proof of

1   claim may be filed to the extent and under the conditions stated in Rule 3002(c)(2),

2   (c)(3), (c)(4) and (c)(6)."

3          Therefore, the appropriate procedure for the assertion of a claim arising from the

4   avoidance of a claimant's interest in property in a chapter 11 case is for that claimant to

5   file a proof of claim, or, in an appropriate case, a request for payment of an expense of

6   administration by such deadline as may be established by the Court for this purpose.

7   This Court will decide in the resulting contested matter whether and to what extent the

8   Defendant is entitled to recover any portion of the Affiliate Payments.[3]  Concurrently

9   herewith, the Court will enter an order setting a deadline for the Defendant to file any

10  such claims and requests.

11

12

13                                              **VI**

14                                     **CONCLUSION**

15         As a general rule, a court cannot grant summary judgment when the key issue is

16  the intent with which a party engaged in a particular act, but this case is the exception

17  that proves the rule.  The facts and circumstances surrounding the Subject Transfer,

18  combined with Hudson's sworn admission as to the purpose of the transaction and the

19  complete absence of any evidence or testimony providing an alternate explanation for

20

21

22

23

24

25

26

27

28
_____
[3] The pendency of this separate contested matter does not prevent the judgment that the Court will be entering
concurrently herewith from being a final judgment, fully resolving this adversary proceeding.

the structure of the transaction compel the conclusion that the Trustee is entitled to summary judgment on his First Claim for Relief.  Accordingly, the Court will enter an order and judgment to this effect concurrently herewith.

# # #

Date: August 25, 2017

Sheri Bluebond
United States Bankruptcy Judge